UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

CHRISTOPHER NOWAK,

      Plaintiff,                            Case No.  1:16-CV-511

v.

                                    HON. GORDON J. QUIST

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____/

## OPINION

      This is a social security action brought under 42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of the Social Security Administration (Commissioner) denying Plaintiff's claim for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act.  Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.  The Commissioner has found that Plaintiff is not disabled within the meaning of the Act.

### STANDARD OF REVIEW

      The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision.  *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  The Court may not conduct a *de novo* review of the case, resolve evidentiary conflicts, or decide questions of credibility.  *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  It is the Commissioner who is charged with finding the

facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Health & Human Servs.*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever evidence in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984). The substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was forty-six years of age on the date of the alleged onset of disability. (PageID.71, 80.) He previously completed high school and has worked as a construction worker and as a glazer. (PageID.65, 206.) Plaintiff applied for benefits on April 23, 2013, alleging disability beginning May 10, 2012, due to a shoulder and neck injury. (PageID.71, 80, 175–186.) These applications were denied on September 11, 2013, after which time Plaintiff requested a hearing before an ALJ. (PageID.93–100, 105–106.) On May 1, 2015, Plaintiff appeared with his counsel before ALJ William G. Reamon for an administrative hearing, at which time both Plaintiff and a

vocational expert (VE) testified.  (PageID.46–69.)  On June 18, 2015, the ALJ issued an unfavorable

written decision that concluded Plaintiff was not disabled.  (PageID.28–45.)  On March 18, 2016,

the Appeals Council declined to review the ALJ's decision, making it the Commissioner's final

decision in the matter.  (PageID.23–25.)  Plaintiff subsequently initiated this action under 42 U.S.C.

§ 405(g).

## ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating

disability.  *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[1]  If the Commissioner can make a

dispositive finding at any point in the review, no further finding is required.  *See* 20 C.F.R.

§§ 404.1520(a), 416.920(a).  The regulations also provide that if a claimant suffers from a

nonexertional impairment as well as an exertional impairment, both are considered in determining

the claimant's residual functional capacity (RFC).  *See* 20 C.F.R. §§ 404.1545, 416.945.

Plaintiff has the burden of proving the existence and severity of limitations caused

by his impairments and that he is precluded from performing past relevant work through step four.

*Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).  At step five, it is the

---

[1]1.    An individual who is working and engaging in substantial gainful activity will not be found to be
"disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b), 416.920(b));

2.    An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R.
§§ 404.1520(c) 416.920(c));

3.    If an individual is not working and is suffering from a severe impairment which meets the duration
requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of
Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors
(20 C.F.R. §§ 404.1520(d), 416.20(d));

4.    If an individual is capable of performing work he or she has done in the past, a finding of "not
disabled" must be made (20 C.F.R. §§ 404.1520(e), 416.920(e));

5.    If an individual's impairment is so severe as to preclude the performance of past work, other factors
including age, education, past work experience, and residual functional capacity must be considered
to determine if other work can be performed. (20 C.F.R. §§ 404.1520(f), 416.920(f)).

Commissioner's burden "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Id.*

ALJ Reamon determined that Plaintiff's claim failed at step five. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged disability onset date. (PageID.33.) At step two, the ALJ found that Plaintiff suffered from the severe impairments of status-post two left shoulder surgeries (rotator cuff repair and labrum injuries) and degenerative disc disease of the cervical spine. (PageID.33.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of the Listing of Impairments found in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (PageID.34.) At step four, the ALJ determined that Plaintiff retained the RFC based on all the impairments to perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), with the following additional limitations: (1) occasional use of ramps and stairs; (2) no use of ladders, ropes, and scaffolds; (3) no overhead reaching and occasional reaching on the right side; (4) occasional balancing, stooping, and crouching; (5) no kneeling and no crawling; and (6) avoiding concentrated exposure to extremes of temperature, humidity, and hazards. (PageID.34.) Continuing with the fourth step, the ALJ determined that Plaintiff was unable to perform any of his past relevant work. (PageID.39.) At the fifth step, the ALJ questioned the VE to determine whether a significant number of jobs exist in the economy that Plaintiff could perform given his limitations. *See Richardson*, 735 F.2d at 964. The VE testified that Plaintiff could perform work in the following representative jobs: folder (52,000 national positions), assembler of small parts (54,000 national positions), and garment sorter (51,000 national positions). (PageID.66–68.) Based on this record, the ALJ found that Plaintiff was capable of making a successful adjustment to work that exists in significant numbers in the national economy. (PageID.41.)

Accordingly, the ALJ concluded that Plaintiff was not disabled from May 10, 2012, the alleged disability onset date, through June 18, 2015, the date of decision.  (PageID.41.)

## DISCUSSION

### 1.     The ALJ's Evaluation of the Treating Physician Opinion.

On October 10, 2013, Dr. Daniel Mass completed a form report regarding Plaintiff's impairments.[2]  (PageID.332–335.)  Dr. Mass reported that Plaintiff was more limited than the ALJ ultimately concluded.  The ALJ afforded "reduced weight" to Dr. Mass's opinion.  (PageID.38.) Plaintiff argues that he is entitled to relief on the ground that the ALJ failed to articulate good reasons for discounting the opinion of his treating physician.

By way of background, the treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into his medical condition.  *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).  An ALJ must, therefore, give controlling weight to the opinion of a treating source if: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375–76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data."  *Miller v. Sec'y of Health & Human Servs.*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health & Human Servs.*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)).  The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence.

---

[2] The ALJ appears to have misspelled Dr. Mass's name as Dr. Moss.

*See Cohen*, 964 F.2d at 528; *Miller*, 1991 WL 229979 at *2 (citing *Shavers,* 839 F.2d at 235 n.1); *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286–87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must provide "good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Simply stating that the physician's opinions "'are not well-supported by any objective findings' and are 'inconsistent with other credible evidence'" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Id.* at 376–77.

Much of Dr. Mass's opinion is consistent with the ALJ's RFC determination. For example the doctor declined to offer a limitation regarding how often Plaintiff could sit, stand, or walk. He also indicated that Plaintiff would not need to change position between sitting and standing, and was capable of walking effectively. (PageID.332.) Nevertheless the doctor reported that during an eight-hour day, Plaintiff could never use his left upper extremity to lift or carry even five pound weights due to a positive cubital tunnel sign with hand weakness. (PageID.332.) Plaintiff furthermore could never use his left upper extremity to reach above his shoulder, and could also never kneel, crouch, crawl, or climb ladders, ropes, and scaffolds. (PageID.333.) The doctor also found that Plaintiff could never use his left hand to handle, finger, or feel. (PageID.333.) Similarly, Plaintiff could never use his left arm to push, pull, or operate hand controls. (PageID.334.) Finally, Dr. Mass indicated that were he to work, Plaintiff could be expected to be absent from work more

than four days per month.[3]  (PageID.335.)

> After summarizing Dr. Mass's opinion, the ALJ gave it the following consideration:

> > The claimant underwent an ulnar nerve transposition for cubital tunnel syndrome on the left side with lengthening of the flexor pronator mass on the left (Exhibit 10F/68).  It appears that [Dr. Mass's opinion] was authored just days before this surgery.  The post-surgery medical treatment is not convincing or persuasive that any of the limitations that Dr. Moss proposed last for any continuous 12-month period.

(PageID.39.)  Plaintiff contends the reasons offered by the ALJ are unsupported by substantial evidence.  The Court disagrees.

As an initial matter, the Court observes that on the check-box form that Dr. Mass completed, Dr. Mass repeatedly failed to respond when asked for supportive medical findings, clinical notes, or test results.  On the occasions when he did respond, the doctor provided only cryptic notations that Plaintiff had cubital tunnel syndrome with hand weakness, and that Plaintiff needed surgery.  The Sixth Circuit has recently observed that these "rudimentary" unsupported checkmark forms with no further explanation are of limited usefulness.  *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474 (6th Cir. 2016).  In any event, the ALJ's observation that Plaintiff's treatment for his cubital tunnel syndrome was inconsistent with the severity of the doctor's opinion is well supported.

Plaintiff's treatment for his cubital tunnel syndrome, the only diagnosis referenced by Dr. Mass for his opinion, was brief and successful.  On September 9, 2013, Plaintiff saw Dr. Mass for his ten-week followup after a repeat arthroscopy on his left shoulder.  (PageID.479.)

---

[3] While asserting that the ALJ's discussion satisfies the treating physician rule, the Commissioner also argues that any error would be harmless as the ALJ posed these limitations in a hypothetical to the VE, who responded that under these limitations, a claimant similar to Plaintiff could perform the duties of a surveillance system monitor with 50,000 positions existing in the national economy.  (PageID.66.)  The Commissioner provides a litany of cases finding that such numbers constitutes a significant number of jobs.  Here, however, the ALJ did not include Dr. Mass's limitation regarding the times Plaintiff would be expected to be absent from work (PageID.65–66) and as such the Court is unable to find harmless error in this case.

Plaintiff had been doing physical therapy and it was noted that he was making good progress. Three weeks earlier Plaintiff was reaching for something and felt and increase in pain. But since then, his pain had been slowly resolving. A physical exam found a range of motion to forward flexion at 110 degrees and abduction at 90 degrees, external rotation at 60 degrees, internal rotation to the hip pocket, full strength to biceps curl, abduction and external rotation. Dr. Mass ordered continued physical therapy. The doctor noted, however, that Plaintiff reported some paresthesias in the ulnar nerve distribution, especially when Plaintiff was laying his elbow on a table. Dr. Mass indicated that Plaintiff might need ulnar nerve transposition in the future. (PageID.479.)

Only a month later, Plaintiff was scheduled for surgery to correct the cubital tunnel syndrome. At his pre-operative examination on October 9 (the day before the doctor completed his opinion) Dr. Mass noted that Plaintiff reported parenthesis in the ulnar nerve distribution. (PageID.472.) A physical exam revealed weakness in abduction as well as in adduction, and the doctor observed a positive Tinel's sign. (PageID.474.) Plaintiff underwent the ulnar nerve transposition for cubital tunnel syndrome a few days later on October 14, 2013. (PageID.462.) By his one-week checkup on October 21, 2013, Plaintiff had almost full range of motion and was not taking a lot of pain medications. Dr. Mass prescribed light motion and no lifting of more than a pound for the next three weeks. Thereafter, the doctor stated Plaintiff should start a strengthening program. (PageID.439.)

On November 26, 2013, Plaintiff saw Dr. Mass for his six week checkup. (PageID.431.) It had also been four months since his second surgery on his left shoulder. Plaintiff reported he was doing much better. He had some residual numbness in his hand, but said that was continually improving. Plaintiff also was continuing with physical therapy and working on increasing his strength. By January 28, 2014, Dr. Mass recorded that Plaintiff was "basically completely comfortable on [his cubital tunnel syndrome] and covered." (PageID.418.)

All this provides overwhelming evidence in support of the ALJ's observation that Plaintiff experienced relief from his cubital tunnel syndrome after surgery and that this impairment lasted less than twelve months. Plaintiff contends, however that the ALJ erred in stating that the limitations offered by Dr. Mass were attributed to Plaintiff's cubital tunnel syndrome. (PageID.631-632.) He notes that Dr. Mass had been treating Plaintiff for several other ailments and that Plaintiff continued to be treated for his left upper extremity following surgery. The problem for Plaintiff, however, is that it was Dr. Mass, not the ALJ, who indicated that the limitations he offered were due to Plaintiff's cubital tunnel syndrome. No mention of any other ailments was made on the opinion. It therefore was reasonable for the ALJ to depend on the treatment notes regarding Plaintiff's cubital tunnel syndrome.

But even if the Court were to consider the other records, such would not help Plaintiff's case. Plaintiff's treatment began after he injured his left shoulder while at work on May 8, 2012. Plaintiff's feet came out from under him and he landed on his outstretched left hand. (PageID.278.) A physical exam conducted by Dr. Mass demonstrated pain when trying to move the shoulder. Plaintiff had a positive Jobe's test, but no pain at the AC or SC joint. He also had no neck pain. (PageID.277.) Dr. Mass reviewed a "very poor quality MRI" which appeared to show a near complete rotator cuff tear, and Dr. Mass suspected Plaintiff would need a rotator cuff repair. (PageID.277.) On August 27, 2012, Dr. Moss reviewed a new MRI scan and confirmed a labral tear with an associated paralabral cyst. (PageID.278.) Dr. Mass scheduled surgery for a left shoulder arthroscopy, SLAP repair, and to drain the cyst. (PageID.280.)

Plaintiff was next seen by Dr. Mass on October 15, 2012, six weeks after undergoing surgery. (PageID.282.) Plaintiff reported that his shoulder pain was improving, and that he had stopped using a sling at home, though he still wore it out of the house. He was not able to return to

work, however, as they did not have any desk work available for him. (PageID.282.) Plaintiff reported, however, that he had intense burning, tingling, numbness, and pain along the lateral aspect of his forearm and through his thumb and index finger. (PageID.282.) Plaintiff stated that this bothered him more than his shoulder at this point. (PageID.282.) Dr. Mass concluded that Plaintiff was recovering well from surgery, but that he had what appeared to be a C6 distribution pain and tingling. Based on testing done on that date, Dr. Mass thought that the pain was due to compression of a nerve that was exacerbated by wearing the sling. (PageID.282.) Dr. Mass advised Plaintiff to stop wearing his sling so that he could work on motion, and also referred Plaintiff to physical therapy to work on range of motion and strengthening. (PageID.282.)

On November 26, 2012, Dr. Mass saw Plaintiff for the three-month checkup. (PageID.284.) Plaintiff felt that his left shoulder continued to improve both with strength and range of motion. He also felt his pain had decreased. (PageID.284.) What was more concerning for Plaintiff at that appointment was neck pain that radiated into his hand. After performing a physical exam, Dr. Mass again found that Plaintiff was recovering well from surgery, but that he had persisting cervical pain. (PageID.285.) Dr. Mass ordered another round of physical therapy, as well as imaging studies. (PageID.285.)

On January 21, 2013, Plaintiff reported that his shoulder continued to improve, but that the improvement had begun to taper off. He again reported neck pain that radiated down his arm and also reported some weakness in his left side. On exam, Plaintiff had some discomfort with the left shoulder as well as with ambulation. (PageID.286.) He had a positive Spurling's test which indicated pain radiating down Plaintiff's upper extremity. He also had continued weakness when internally and externally rotating his shoulder. (PageID.286.) Dr. Mass ordered an EMG of his left arm, and referred Plaintiff to a pain management specialist. (PageID.287.)

On April 26, 2013, Plaintiff reported significant shoulder pain and neck pain radiating down his left arm. A physical exam found pain with all provocative testing, including Jobe's O'Brien's, Speed's, and Yergason's testing. He also had a positive Spurling's test. (PageID.288.) Because of these symptoms, Dr. Mass ordered another MRI to check for a re-tear in Plaintiff's shoulder. He also ordered imaging of Plaintiff's cervical spine and referred Plaintiff to a neurosurgeon. (PageID.288.)

On June 4, 2013, Plaintiff continued to complain of shoulder and neck pain. He again had a positive Spurling's test, and pain with Jobe's, O'Brien's, Speed's and Yergason's testing. (PageID.290.) An MRI of Plaintiff's shoulder demonstrated a likely recurrent SLAP tear. And an MRI of the cervical spine also found severe degenerative disc disease with mild to moderate compression at C3-C4. (PageID.290.) Dr. Mass concluded that Plaintiff required a repeat arthroscopy regarding his left shoulder and also made another referral to a neurosurgeon to evaluate Plaintiff's neck. (PageID.290.)

Plaintiff underwent EMG testing on July 1, 2013. (PageID.315.) Plaintiff complained of left sided neck pain with radiation into the left arm, as well as left lower back pain with radiation in the left leg. He complained of tingling in the entire left arm and leg. Plaintiff stated he had dropped items from his left hand in the past, and had also fallen at least once in the last year because his left leg had given out. (PageID.315.) On exam, however, Plaintiff had full strength in all extremities. (PageID.315.) After testing, it was noted that the results were an abnormal study demonstrating a moderate left median neuropathy at the wrist which was likely incidental. There was, however, no evidence of large fiber neuropathy and no evidence of left cervical or left lumbar radiculopathy. (PageID.315.)

Plaintiff underwent a repeat arthroscopy involving a left shoulder revision SLAP repair and biceps tenodesis on his left shoulder on July 3, 2013. At his checkup with Dr. Mass two

weeks later on July 15, 2013, Plaintiff reported he was doing well. His pain was much better and improved following the procedure. Other than some stiffness, he had no other complaints. (PageID.318.) He was given some strengthening exercises, and physical therapy was ordered to begin in four weeks. (PageID.318.)

On August 15, 2013, Plaintiff saw Dr. Ben-Zion Roitberg regarding his cervical pain. It was noted that an MRI of the lumbar spine was normal, and an EMG and nerve conduction study for the upper and lower extremities was unremarkable and noncontributory. (PageID.483.) Dr. Roitberg noted the disc bulge at the C6-7 disk that was impinging on the spinal cord. But his symptoms were not classical for myelopathy or radiculopathy. (PageID.483.) The doctor stated it was feasible, and might be reasonably safe, to perform a diskectomy and stated that Plaintiff might get better, but also stated it was difficult to predict the chance of success. He invited Plaintiff to be in touch if he wanted to proceed with surgery. (PageID.483.)

As noted above, on September 9, 2013, Plaintiff saw Dr. Mass for his ten-week followup after the repeat arthroscopy. (PageID.479.) Plaintiff was making good progress following physical therapy, and a physical exam found a range of motion to forward flexion at 110 degrees and abduction at 90 degrees, external rotation at 60 degrees, internal rotation to the hip pocket, full strength to biceps curl, abduction and external rotation. (*Id.*)

On October 22, 2013, Plaintiff saw Dr. Roitberg regarding his neck pain and discomfort. Plaintiff reported that his symptoms had not changed much since August, and he had neck pain when trying to raise his hands over his head. (PageID.435.) Plaintiff wondered if there could be changes made to his course of physical therapy or if there were surgical options. Dr. Roitberg reviewed Plaintiff's MRI. Dr. Roitberg's advice was similar to that he had given to Plaintiff in August. He again noted the disc bulge with disc displacement at C6-7, but found that

Plaintiff did not have symptoms that could be attributed to cervical myelopathy.  It was not common for the doctor to operate for the primary indication of neck pain.  Given the uncertainty, the doctor felt it reasonable to continue to observe and not operate.  But he also said it was reasonable to operate, though it was difficult to predict what the results would be.  (PageID.435.)  He noted that Plaintiff had not made up his mind regarding surgery.  It does not appear that Plaintiff ever elected to undergo surgery on his cervical spine.

On November 4, 2013, Plaintiff met with Dr. Michael Kelly in order to establish care. He complained of hyperlipidemia, hearing loss, and back, arm, and neck pain.  (PageID.368.)  On exam, Plaintiff's neck had a normal range of motion, and there was normal range of motion across the musculoskeletal system.  Plaintiff also had no cervical adenopathy.  (PageID.370.)  Plaintiff was referred to an ENT for his hearing loss, and given pain medications.  (PageID.371.)  Plaintiff had repeat visits with Dr. Kelly on November 15, 2013, January 3, 2014, and February 14, 2014, that had similar physical examination results.  (PageID.342, 349, 361.)

On November 21, 2013, Plaintiff saw Dr. Deborah Habenicht, M.D. for hearing loss. (PageID.387.)  He was assessed with eustachian tube dysfunction (ETD) and sensory hearing loss. (PageID.389.)  On November 26, 2013, Plaintiff saw Dr. Mass for his six week checkup post left cubital tunnel ulnar nerve transportation.  It had also been four months since his second surgery on his left shoulder.  Plaintiff reported he was doing much better. He noted, however, that his shoulder was hurting more after physical therapy.  A physical exam found that he was neurovascularly intact. (PageID.431.)  He had full range of motion of the left elbow, and full range of motion of the wrist and fingers.  An examination of his shoulder also found full range of motion, although there was some pain.  (PageID.431.)  Dr. Mass's assessment was that overall, Plaintiff was doing well.  He gave Plaintiff an injection to help with the swelling in Plaintiff's shoulder.  (PageID.431.)  On

January 15, 2014, Plaintiff complained to Dr. Habenicht of right ear pain. He also complained of tightening in his neck muscles and some swelling. (PageID.384.) He was again assessed with ETD and hearing loss, as well as myositis, a type of inflammation. (PageID.384.)

On January 28, 2014, Plaintiff reported that his left shoulder still hurt after his second surgery and there was also some neck pain on the right side that was hurting his ear. Dr. Mass gave Plaintiff an injection at the AC joint and noted that Plaintiff left pain free. (PageID.418.) On February 26, 2014, Plaintiff told Dr. Habenicht that he had much less pain. He had been doing physical therapy and was feeling better. (PageID.383.)

On March 20, 2014, however, he told Dr. Mass that he continued to have pain in his shoulder along with whole arm numbness. He also complained of lower extremity parenthesis. (PageID.414.) An exam found good abduction in the shoulder and internal rotation. Active external rotation caused pain, but there was intact strength. It was noted that Plaintiff "possibly" needed surgery on his neck and shoulder, but he needed to see a neurosurgeon to confirm surgery on his neck. Dr. Mass scheduled arthroscopic surgery for Plaintiff's shoulder. (PageID.414.)

The next day Plaintiff met with Dr. James Mok. (PageID.396.) He complained of neck and low back pain. He stated that since his injury in May 2012, he had pain in all four of his extremities. Plaintiff also complained mostly of right-sided shoulder and leg pain. (PageID.396.) A physical examination found that Plaintiff was able to walk normally. He had good range of motion with a fairly good range of motion in his neck. He had a negative Hoffman and Spurling sign. (PageID.396.) Dr. Mok concluded that since Plaintiff's neurological exam was essentially normal, surgery was not indicated. (PageID.397.) In fact, he was not sure that surgery would make Plaintiff feel any better. Instead, Dr. Mok recommended physical therapy and emphasized that Plaintiff should maintain motion in his neck. (PageID.397.)

Subsequent records all related to visits with Dr. Kelly. On these visits, Plaintiff's primary complaints were of neck and back pain, with only occasional complaints regarding his left shoulder, as well as sporadic complaints regarding depression, rash, sinus problems, and hypertension. (PageID.490, 504, 527, 536, 552, 568, 595, 607.) These exams generally found decreased range of motion, pain, and spasm in his cervical back, pain in his thoracic back, and pain and spasm on his lumbar back. To treat the pain, Dr. Kelly prescribed ibuprofen and norco, as well as MS Contin. Plaintiff consistently reported experiencing moderate relief with this treatment, and Dr. Kelly noted that with the medication, Plaintiff was able to maintain his activities of daily living. (PageID.570, 582, 595, 509.)

In sum, these records demonstrate that Plaintiff sought consistent treatment for shoulder, neck, and back pain. While the Court does not doubt that Plaintiff experiences a certain amount of limitation due to his pain, these records do not support the extreme limitations offered by Dr. Mass. Most notably, Plaintiff appears to have experienced complete relief from his cubital tunnel syndrome, which was the sole supportive diagnosis offered by Dr. Mass in his form opinion. While Plaintiff continued to receive treatment for his left shoulder, as well as his back and neck, Dr. Roitberg and Dr. Mok found that objective studies did not require surgery (although Dr. Roitberg also did not rule it out) and were inconsistent with myelopathy or radiculopathy. Plaintiff was able to maintain moderate relief and daily activities with treatment. For all the above reasons, the Court finds that substantial evidence supports the reasons offered by the ALJ for assigning only little weight to Dr. Mass's opinion.

It appears that Plaintiff also contends the ALJ, after assigning Dr. Mass's opinion less than controlling weight, failed to weigh the opinion under the factors found in 20 C.F.R. §§ 404.1527(c), 416.927(c). (PageID.634–635.) Plaintiff correctly notes that if the ALJ affords less

than controlling weight to a treating physician's opinion, the ALJ must still determine the weight to be afforded such. *Gayheart*, 710 F.3d at 376. In doing so, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination; (2) nature and extent of the treatment relationship; (3) supportability of the opinion; (4) consistency of the opinion with the record as a whole; (5) the specialization of the treating source; and (6) other relevant factors. *Id.* (citing 20 C.F.R. § 404.1527). While the ALJ is not required to explicitly discuss each of these factors, the record must nevertheless reflect that the ALJ considered those factors relevant to his assessment. *See, e.g.*, *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 F. App'x 448, 450 (5th Cir. 2007).

Plaintiff has not demonstrated any error. Indeed the ALJ began his discussion of the medical record by noting his obligation to consider the evidence in accordance with, among other things, 20 C.F.R. §§ 404.1527, 416.927. (PageID.36.) The ALJ then considered several of the factors articulated in the regulation, including the doctor's status as a treating physician, whether the treating physician's opinion was "well-supported by medically acceptable clinical and laboratory diagnostic techniques", whether it was "inconsistent with the other substantial evidence in [the] case record", and how the evidence in the record informed the ALJ's determinations on each of these factors. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). Regardless of the other factors which the regulation required the ALJ to consider—such as the length, nature and extent of the treatment relationship, 20 C.F.R. § 404.1527(c)(2), and Dr. Mass's degree of specialization in this field, 20 C.F.R. § 404.1527(c)(5)—the evidence mentioned thus far provide substantial evidence for the ALJ's decision to accord Dr. Mass's opinion little weight. No matter how long Dr. Mass had been treating Plaintiff or how much experience he has with such conditions, the record supports the ALJ's findings that the doctor's notes failed to support the extreme restrictions provided in his opinions.

Finally, Plaintiff contends the ALJ erred in assigning significant weight to the opinion of the non-examining physician, Dr. Mohiuddin. (PageID.39.) The Court again discerns no error. Social Security regulations recognize that opinions from non-examining state agency consultants may be entitled to significant weight, because these individuals are "'highly qualified'" and "'experts in Social Security disability evaluation.'" *Cobb v. Comm'r of Soc. Sec.*, No. 1:12–cv–2219, 2013 WL 5467172, at *5 (N.D. Ohio Sept. 30, 2013) (quoting 20 C.F.R. §§ 404.1527(e)(2)(I), 416.927(e)(2)(I)); *see Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). Indeed, "in appropriate circumstances, opinions from State agency medical and psychological consultants . . . may be entitled to greater weight than the opinions of treating or examining sources.*" Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 642 (6th Cir. 2013).

The ALJ is responsible for weighing conflicting medical opinions. *See Buxton v. Halter*, 246 F.3d 762, 775 (6th Cir. 2001); *see also Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) ("This court reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ."). Where a treating physician's opinion is not supported by objective medical facts, a non-examining physician's opinion may be accepted over it "when the non-examining physician clearly states the reasons for his differing opinion." *Carter v. Comm'r of Soc. Sec.*, 36 F. App'x 190, 191 (6th Cir. 2002). Here, it is patent the ALJ understood the agency consultant had not examined Plaintiff, but nonetheless noted that the opinion was consistent with the record and was based upon the consultant's detailed knowledge of agency regulations. (PageID.39.) Furthermore, the ALJ found that Dr. Mass's opinion was not well supported and was inconsistent with the record. As laid out above, the ALJ offered good reasons, supported by substantial evidence for this determination, and accordingly Plaintiff does not identify a reversible error.

## 2.    The ALJ's Evaluation of Plaintiff's Credibility.

At the administrative hearing, Plaintiff testified that he was impaired to an extent far greater than ultimately recognized by the ALJ.  As summarized by the ALJ;

> [T]he claimant testified that he has not worked since May 10, 2012. He said that he has a current driver's license and drives "when he can".  He explained that he cannot hold the steering wheel with his left arm because of instant pain and that, if he is in the car for more than 10-15 minutes, the car's vibration affects his neck and the left side of his body.  He said that his wife drove the 75 miles to the hearing and that he could not have made it without her.
>
> The claimant testified further that he could not lift much with the right arm because of tightness of the shoulder, neck, and back.  He said his wife has to help feed him if he is shaking too badly and she cuts the food.  He said that she helps him get dressed and shower because he cannot bend his left arm behind his back.  He said that he continues to have falls and he has fallen in the shower.  He indicated that he fell this morning getting out of a chair and that he almost fell stepping onto a six-inch curb.  He said that he does not have a "best" position and that he can sit, stand, or walk for 30 minutes each, in small increments.

(PageID.37.)   After summarizing these allegations, the ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible. (PageID.37.)  Specifically, the ALJ noted that:

> I do not find sufficient evidence to support the claimant's testimony concerning his falls and his tendency to fall.  Despite treating with physicians, including and orthopedist, I see no references to falls except for the original injury in May 2012.  Thereafter, the claimant's gait is described rather consistently as negative for abnormalities. Additionally, the claimant's ambulation is consistently described as effective and independent (without the use of an assistive device).
>
> I do not find evidence to shakiness of the left side of the body to the degree that the claimant would reasonably require assistance with feeding or showering.  Rather, with treatment and the use of medication, the claimant is able to perform most activities of daily living; there are also not indications of considerable side effects (Exhibit 11F/5).  On October 28, 2014, the claimant was well appearing with no complications.  Pain and anxiety medications

18

> allowed him to maintain functioning in order to perform activities of daily living and/or employment (Exhibit 13F/22). This is a representative statement of the claimant's functioning ability and it is not an isolated reference (Exhibits 11F/5 and 13F/10, 49).
>
> Overall, I find many of the claimant's complaints at the hearing to be rather vague and non-specific. The claimant's alleged functional restrictions are not contained in the longitudinal record of medical treatment are nor are such difficulties consistent with such evidence.

(PageID.37–38.) In his second claim of error, Plaintiff contends the ALJ mischaracterized his testimony and that the ALJ further erred when he referenced Plaintiff's activities of daily living. The Court disagrees.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, may be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984); *see also Grecol v. Halter*, 46 F. App'x 773, 775 (6th Cir. 2002). As the relevant Social Security regulations make clear, however, a claimant's "statements about [his] pain or other symptoms will not alone establish that [he is] disabled." 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)); *Hash v. Comm'r of Soc. Sec.*, 309 F. App'x 981, 989 (6th Cir. 2009). Instead, a claimant's assertions of disabling pain and limitation are evaluated under the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted). This standard is often referred to as the *Duncan* standard. *See Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801 (6th Cir. 2004).

Accordingly, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Id.* (citing *Blankenship*

19

*v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Id.* (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Id.* (citing *Walters*, 127 F.3d at 531); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) (quoting *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972) ("It [i]s for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony")). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully credible, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 780 (6th Cir. 1987). In fact, as the Sixth Circuit has stated, "[w]e have held that an administrative law judge's credibility findings are virtually unchallengeable." *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (citation omitted).

Plaintiff contends that the ALJ erred in stating that he did not "find evidence to shakiness of the left side of the body to the degree that the claimant would reasonably require assistance with feeding or showering." He contends that he never testified that he is experiencing shaking on the entire left side of the body, or that he needed his wife to feed him. He further contends that he testified that he needed help showering because of pain, not because of shaking. (PageID.639.) Plaintiff has identified, at most, minor harmless errors. *See Shinseki v. Sanders*, 556 U.S. 396, 407 (2009) (recognizing that the harmless error doctrine is intended to prevent reviewing courts from becoming "impregnable citadels of technicality"); *Heston v. Comm'r of Soc. Sec.*, 245

F.3d 528, 535–36 (6th Cir. 2001) (recognizing that remand to correct an error committed by the ALJ was unnecessary where such error was harmless); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("no principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result").

Indeed, at the hearing, Plaintiff testified that driving affected his "whole left side" and was why he was shaking. (PageID.50.) He testified that there were times when he shook so bad he couldn't get food from the plate to his mouth. (PageID.57.) He testified that his wife would help cut his food, and assist him when getting dressed. She also helped him take showers because he couldn't bend his left arm into his back. (PageID.58.) Accordingly, it does not appear the ALJ erred when he said the Plaintiff testified regarding shaking on his left side of his body, or that he needed help with feeding.

But the gravamen of the ALJ's point was that Plaintiff's complaints were inconsistent with his activities of daily living. It was appropriate for the ALJ to take Plaintiff's daily activities into account in making his credibility determination. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007); *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir.1990). Plaintiff asserts that the "ALJ points to no evidence of Plaintiff performing daily activities regularly in the record." (PageID.639.) The ALJ, however, in fact did just that. The records referenced by the ALJ demonstrated that on July 24, 2014, Dr. Kelly found that Plaintiff's condition was "improved with medication" and he was "[a]ble to maintain most activities while taking medication." (PageID.492.) On October 7, 2014, Dr. Kelly again noted that "[p]ain medications allow the patient to maintain function to perform activity of daily living and or employment. Anxiety medications allow the patient to maintain function to perform activity of daily

living and or employment." (PageID.570.) Dr. Kelly repeated this statement on October 28, 2014 (PageID.582), on January 29, 2015 (PageID.595), and on February 27, 2015. (PageID.609.) Accordingly, the ALJ's observation that Plaintiff was able to perform his activities of daily living is supported by overwhelming evidence.

For all the above reasons, therefore, the Court finds the ALJ properly assessed Plaintiff's credibility and sufficiently articulated his reasons for finding the severity of Plaintiff's complaints were not entirely credible. This claim of error is accordingly denied.

## CONCLUSION

For the reasons articulated herein, the Court concludes that the ALJ's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **AFFIRMED**.

A separate judgment shall issue.


Dated:  June 29, 2017                         _____/s/ Gordon J. Quist_____
                                      GORDON J. QUIST
                                  UNITED STATES DISTRICT JUDGE